IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONNELL L. by and through his guardian ad litem, Janet Butler,<br><br>                Plaintiff,<br>    vs.<br><br>COMMISSIONER OF SOCIAL SECURITY MICHAEL J. ASTRUE, Commissioner of Social Security,<br><br>                Defendant. | Case No. 1:09-cv-00991-JLT<br><br>ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT<br><br>ORDER DIRECTING THE ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT MICHAEL J. ASTRUE AND AGAINST PLAINTIFF CONNELL L. |

BACKGROUND

Plaintiff Connell L. ("Claimant" or "Plaintiff") is a child who is proceeding through his guardian ad litem, Janet Butler. Plaintiff seeks judicial review of an administrative decision denying his claim for supplemental security income ("SSI") benefits under Title XVI of the Social Security Act (the "Act").

**FACTS AND PRIOR PROCEEDINGS**[1]

On February 21, 2006, Plaintiff's great-aunt and guardian ad litem, Janet Butler, filed an application for SSI benefits. AR at 11. After benefits were denied by the agency, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Id. A hearing was held on November 11,

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

2008. Id. at 21-55. On March 19, 2009, the ALJ issued a decision denying benefits. Id. at 8-20. On April10, 2009, the Appeals Council affirmed this decision. Id. at 2-5.

Hearing Testimony

Plaintiff's great-aunt and guardian, Janet Butler, provided the bulk of the testimony in support of Plaintiff's claim. Butler testified that she picked Plaintiff up at the hospital when he was born on August 16, 2001, and he has lived with her since that time. AR at 29. She stated that Plaintiff's mother was on drugs when he was born. Id. at 42. Butler stated that she lived alone with Plaintiff, although Plaintiff had siblings who lived elsewhere. Id. at 37.

Butler testified that Plaintiff was in the second grade. AR at 30. She stated that he was in special education classes, but under questioning appeared to concede that, instead, he received special aid, including tutoring, in a regular classroom setting. See AR at 30. In fact, later in her testimony, Butler stated that Plaintiff attended "regular school." Id. at 36.

Butler testified that Plaintiff performed below normal in reading and language. AR at 44. She recounted that she helped him with his homework. Id. She stated that an occupational therapist at school helped him improve his motor skills. Id.

Butler testified that Plaintiff had asthma. AR at 34. She stated that he used a nebulizer for this malady, sometimes three times a day. Id. However, she stated that he used the nebulizer only twice in the week prior to the hearing. Id. She denied that he ever stayed in the hospital overnight because of breathing problems. Id.

Butler testified that Plaintiff had problems with his legs. AR at 42. She described him as experiencing pain "all the time," but conceded that x-rays found nothing to explain it. Id. Nevertheless, Butler estimated that Plaintiff could not walk for more than 10 minutes at a time without experiencing pain. Id. at 45. For this reason, she believed that he could not play for very long. Id.

Butler testified that Plaintiff suffered from atopic dermatitis. AR at 43. She stated that she treated this condition by applying cocoa butter cream to his face. Id. If his hair and scalp were seriously affected, she stated that she would apply "blue salt." Id. Because of this condition, she stated that she kept Plaintiff's hair "real short." Id.

2

1    Butler testified that Plaintiff was hyperactive. AR at 38. She stated that he had trouble
2 concentrating and couldn't focus on anything for more than five minutes. Id. at 44. She reported
3 that he had trouble finishing tasks that he started. Id. at 38. She stated that he never slowed down.
4 Id.

5    Butler testified that Plaintiff took Adderall for his hyperactivity . AR at 39, 45. She believed
6 that the Adderall helped him stay focused for four or five hours at a time. Id. at 45. She claimed that
7 a doctor wanted to increase the dosage to help "slow him down." Id. at 39. Butler testified that
8 Plaintiff took Benadryl at night to help him sleep. AR at 39. However, she believed that if he took
9 Benadryl too frequently it was counterproductive and hindered his ability to sleep. Id. at 39. As a
10 result, she stated that she gave him Benadryl only every other night. Id.

11    Butler testified that she couldn't leave Plaintiff home alone. AR at 40. She related that he
12 didn't recognize dangers and sometimes hurt himself when he got angry. Id. She described him
13 walking around without noticing where he was going. Id. at 42. Plaintiff's lack of awareness
14 frightened her. Id.

15    In addition, Butler testified to Plaintiff's "anger" problems. Id. at 42. She recounted that a
16 teacher told her that he didn't get along with other children and kept to himself. Id. at 38. She stated
17 that when he visited his siblings he didn't get along with them either. Id. Butler testified that
18 Plaintiff had few friends. AR at 31.

19    She stated that he could not tell time or use a newspaper to find television programs, but
20 reported that he could turn the television on and off. Id. at 35-36. She stated that he did no house
21 work. Id. at 38. She did not believe he could use a microwave but indicated that he could make a
22 sandwich. Id. at 41. Butler thought that Plaintiff was incapable of cutting with a knife or using
23 scissors. AR at 36. She stated that he could ride a bicycle and was capable of printing his name. Id.
24 at 36. She stated that he had no hobbies. Id. at 41.

25    Plaintiff testified briefly. He stated that he had two friends. AR at 31. He stated that he
26 played basketball, football and tetherball. Id. His aunt clarified that he did not play any organized
27 sports and believed that he probably played these games at recess. Id. at 32. Plaintiff testified that
28 he could dress himself and brush his teeth. AR at 32. He stated that he could bathe himself and use

utensils like a spoon and fork and use a cup for drinking.  Id.  He stated that he liked to play video games.  Id. at 33.  His aunt, Janet Butler, asserted that he was only permitted to play video games twice a week on the weekends, for an hour at a time.  Id. at 33-34.

Dianne Butler, Janet Butler's sister, testified also.  She stated that she saw Plaintiff about three times a week.  AR at 47.  She agreed that Plaintiff played video games on the weekend for about one hour at a time.  Id. at 48.  She agreed also that he could ride a bicycle, brush his teeth, dress himself, and shower and bathe.  Id.

Dianne testified that she worked with disabled and handicapped children.  AR at 48.  She stated that some of these children had impairments similar to Plaintiff's.  Id. at 49.  As examples, she noted that Plaintiff was incapable of remaining still.  Id. at 50.  She noted that at times he screamed, banged his head, moved around and could not focus.  Id.  Nevertheless, she did not believe his impairments were as serious as those of children at the facility and believed that she and her sister were capable of caring for him at home.  Id. at 51-52.  Dianne believed that Plaintiff suffered from ADHD.  AR at 53.

Medical Record

Medical records from Dr. Jerry Fox diagnosed Plaintiff with asthma in 2005.  AR at 152-53.  He treated Plaintiff with inhalers and medication.  Id. at 153.

Dr. Chuck-Kwan Lee, a pediatrician, examined Plaintiff on June 13, 2006.  He noted a history of ADHD and behavioral troubles.  AR at 181.  In his physical examination, he described Plaintiff as big for his age both in height and weight.  Id.  He noted atopic dermatitis.  Id.

Dr. Lee described Plaintiff's neck, chest and cardiovascular regions as normal.  AR at 181.  He described Plaintiff's extremities as normal also.  Id.  He found Plaintiff's sensory, motor functions and reflexes to be normal.  Id.  However, he characterized Plaintiff's demeanor as "very hyperactive."  Id.

Aside from the dermatitis, Dr. Lee characterized his findings as "unremarkable."  AR at 182.  He believed Plaintiff's asthma was mild and under control.  He noted that testing (the Denver Developmental Screening Test II) showed that Plaintiff performed "within the age limits for gross motor development and at 4-4 ½ years for personal/social, fine motor/adaptive and language

4

development, about six months behind." Id. He believed that the prognosis for Plaintiff's ADHD and behavioral problems was "guarded," but believed that his asthma prognosis was "favorable." Id.

Dr. Michael Musacco, a clinical psychologist, conducted a consultative examination of Plaintiff on June 15, 2006. Dr. Musacco noted Plaintiff's history of ADHD and behavioral problems for which he took Adderall. Id. He noted Plaintiff's impairments of asthma and eczema also. Id.

Dr. Musacco conducted a mental status examination. Plaintiff knew the month of his birth but not the year. AR at 185. Plaintiff did not know his telephone number but did know his age and could recite the alphabet with errors. Id. Dr. Musacco described Plaintiff as bright and "hyper verbal," and found his mood and behavior to be marked by hyperactivity, noting Plaintiff's "excessive energy and impulsivity throughout the evaluation." Id.

Dr. Musacco administered the Stanford-Binet Intelligence Scale. This test revealed a verbal reasoning score of 79, an abstract/visual reasoning score of 68 and a short-term memory score of 85. AR at 185. The test found that Plaintiff had an overall composite IQ of 72, which Dr. Musacco characterized as indicative of borderline intellectual functioning. Id. However, he believed that these test results could be skewed by Plaintiff's hyperactivity and might underestimate his intellectual functioning. See id.

Dr. Musacco administered the Vineland Adaptive Behavior Scales, relying on information provided by Plaintiff's aunt. AR at 186. Based on this information, he reported scores that he believed were indicative of borderline to mild deficits in adaptive functioning. Id.

Dr. Musacco noted that Plaintiff could articulate and tell a fairy tale with clarity. Id. He believed that Plaintiff was capable of sharing toys without being asked and had a preferred friend. Id. However, he noted that Plaintiff could not print or write his name and could not play board or card games or keep secrets. Id.

Dr. Musacco reviewed a teacher questionnaire which indicated that Plaintiff had a "slight problem" in his ability to acquire and use information, a "slight to obvious problem" in his ability to attain and complete tasks, and an "obvious to serious problem" in his ability to interact and relate with others. AR at 186. The teacher indicated that Plaintiff could complete most tasks but had low

motivation. Id.

Dr. Musacco confirmed a diagnosis of ADHD, as well as borderline intellectual functioning which he termed "provisional," and asthma and eczema. AR at 186. He noted that Plaintiff was being treated for the ADHD with medication with "noted improvement in his functioning." Id. He believed that Plaintiff's ADHD affected his social development and rendered him vulnerable to "distractibility and impulsivity" that impacted his ability to maintain concentration and persistence. Id. at 187. However, he described Plaintiff's communication development as intact, and found no evidence of significant deficits in his motor skills. Id.

Dr. V.M. Meenakshi, a non-examining agency consultant, completed a "Childhood Disability Evaluation" form in September 2006. After reviewing the record, Dr. Meenakshi noted Plaintiff's impairments of ADHD, borderline functioning and asthma. AR at 195. However, he believed that these impairments did not meet the listings for disability. Id. Specifically, he found Plaintiff's limitations in the domains of attending and completing tasks, interacting and relating with others, caring for himself and physical health and well-being to be "less than marked." Id. at 197-98. He found "no limitation" in the domain of moving about and manipulating objects. Id. at 198.

In October 2006, Dr. Jenna Walsh, a school psychologist with the Greenfield Union School District, completed an "Initial Psychoeducational Evaluation" of Plaintiff. The stated purpose of the evaluation was to determine Plaintiff's current academic achievement levels, estimate his cognitive ability, determine his adaptive behavior/self-help skills, his behavioral and social strengths, any health needs, and ascertain if he might need and qualify for special education services. AR at 216. Dr. Walsh based her findings on a review of the records, teacher input, a health assessment made by the school nurse, clinical testing, a parent interview, and student observations. Id.

Dr. Walsh noted Plaintiff's diagnosis of ADHD from an early age. AR at 217. Teachers reported behavioral problems including difficulty staying on task, problems writing his name, and a tendency to draw and write things upside down. Id. Information provided by teachers also indicated that Plaintiff could count to 28 and could discern colors, letters and sounds. Id.

Dr. Walsh reported that tests administered to Plaintiff for letter-word identification, math fluency, spelling, passage comprehension (written text) and applied problems, all placed Plaintiff in

the "average" range. AR at 217-18. She characterized Plaintiff's overall cognitive ability as "average" also. Id. at 218. In addition, she recorded Plaintiff as "average" for planning, processing and attention with a "demonstrated . . . ability to follow directions, determine, select, apply and evaluate solutions to problems, as well as integrate separate stimuli into a single or whole group." Id. However, Dr. Walsh noted that Plaintiff's aunt and teacher rated him in the "extremely low range" for adaptive skills. Id. at 219.

Dr. Walsh noted that Plaintiff's aunt described him as frequently acting without thinking, acting out of control, unable to slow down, prone to tantrums and overly active. AR at 220. She believed that the conduct reported by his aunt was indicative of a clinically significant range of both aggression and depression, as well as "atypicality" and attention problems. Id. She noted that Plaintiff's kindergarten teacher recounted similar problems. Id. at 221.

Based on her review, Dr. Walsh believed that Plaintiff had difficulty working independently in the classroom, and had fine and gross motor difficulties. AR at 222. Nevertheless, she noted that he was not aggressive in the classroom and could grasp concepts that were presented to him in that setting. Id. She noted that he had difficulty staying on task and believed his ADHD "may require additional support in the future [for him] to be successful in the classroom environment." Id. She believed that Plaintiff qualified for special education services. Id.

In May 2007, Dr. Walsh completed a "Child Functional Assessment" form finding that Plaintiff had "marked limitations" in the ability to attend and complete tasks. AR at 260. She believed that the medications he took might adversely affect his abilities in this domain. Id. In addition, Dr. Walsh found an "extreme" limitation with respect to Plaintiff's ability to move about and manipulate objects, and a "marked" limitation in the domain of health and physical well-being. AR at 260. In support, she cited Plaintiff's ADHD, "marked muscle weakness," and an inability to stand for more than 10 minutes at a time. Id.

Jami Grover, a school occupational therapist, completed a report in March 2007. With respect to Plaintiff's motor skills, she noted that he could walk the school campus and carry his backpack and could hop on each foot separately. AR at 231. She wrote that he could throw a ball but had difficulty catching it in a coordinated manner. Id.

1    Grover determined that Plaintiff had difficulty with bilateral hand coordination and dexterity.
2  AR at 232.  She noted also that Plaintiff had difficulty performing tasks that required use of both
3  hands.  Id.  Grover believed Plaintiff would benefit from occupational therapy, particularly therapy
4  directed toward addressing his problems with fine motor skills and sensory processing, which she
5  believed impacted his ability to perform in class.  Id. at 234.
6    In March 2007, Dr. Paul Frye, another non-examining agency consultant, completed a
7  "Childhood Disability Evaluation" form.  After reviewing Plaintiff's record, he noted Plaintiff's
8  impairments of ADHD and asthma, but characterized Plaintiff's restrictions as less than marked in
9  the domains of acquiring and using information, attending and completing tasks, interacting and
10 relating with others, caring for himself and health and physical well-being.  AR at 235, 237.  He
11 found no limitation in the domain of moving about and manipulating objects.  Id. at 237.  In an
12 accompanying "Case Analysis," Dr. Frye wrote that he concurred with a previous agency evaluation
13 finding that Plaintiff's impairments did not meet or exceed the listings for disability, noting that
14 Plaintiff had no marked restriction in any of the domains of functioning.  Id. at 241.  Dr. L.T. Luu
15 endorsed Dr. Frye's findings.  Id. at 236.
16    In February 2007, Plaintiff's kindergarten teacher, Rachel Lantay, completed a teacher
17 questionnaire for the agency.  In regard to the first domain of acquiring and using information,
18 Lantay wrote that Plaintiff had a hard time focusing on any instruction.  AR at 224.  She believed
19 that Plaintiff performed at grade level while working and being tutored individually, but believed
20 that he was unable to participate and performed below grade level in group settings.  Id.  With regard
21 to the second domain, attending and completing tasks, Lantay reported that other students helped him
22 because if left to his own he would sit and stare and not complete his activity.  Id. at 225.
23 Concerning the third domain, interacting and relating with others, Lantay stated that Plaintiff did a
24 lot of "parallel play" and only engaged in activities with other students if directly asked.  Id. at 226.
25 Concerning the fourth domain, moving about and manipulating objects, Lantay noted that when
26 singing songs, Plaintiff had difficulty incorporating singing and accompanying hand movements.  Id.
27 at 227.  As to the fifth domain, caring for himself, Lantay noted that he seemed unaware of his
28 physical self and did not attempt to clean food or dirt from his face and hands.  Id. at 228.

Concerning the sixth domain, health and well-being, Lantay noted that Plaintiff took medication for ADHD and wondered if that medication affected his demeanor because he seemed subdued often and looked as if he was about to fall asleep. Id. at 229.

Individual Education Plan ("IEP") records from the Greenfield Union School District indicate that during a meeting with Plaintiff's guardian, Janet Butler, in October 2007, Butler stated that Plaintiff had pain in his hands and leg. AR at 258. The IEP records note that Plaintiff was taking 10 milligrams of Adderall daily for his hyperactivity. Id. at 250. These records documented his trouble working independently but also described him as enjoying video games and looking at books. Id. The records described Plaintiff's math skills as "good." Id. In addition, the records noted that Plaintiff was "making good progress in fine motor skills" and described his coordination and hand skills for tasks such as cutting, fasteners and dexterity as "improving." Id.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. 405 (g). Substantial evidence means "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. E.g., Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. See Sanchez v. Sec'y of Health and Human Serv., 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In determining eligibility for SSI benefits for children based upon disability, the agency will

consider whether the child is performing substantial gainful activity. If the child is not, the agency will consider whether the child suffers from an impairment or combination of impairments that is severe. If the child's impairment is severe, the agency will determine whether the impairments meet, medically equal, or functionally equal the listings and whether the impairment has lasted, or is expected to last, for twelve continuous months. 20 C.F.R. §§ 416.923, 416.924(a). If the child's impairment meets or functionally equals an impairment in the listings and meets the durational requirement, then the child is conclusively presumed to be disabled and the child is entitled to an award of benefits. 20 C.F.R. § 416.924(d). If the impairment does not meet or functionally equal a listed impairment or meet the durational requirement, then the child is not disabled. 20 C.F.R. § 416.924(d)(2).

To determine whether an impairment or combination of impairments functionally equals any listing, the ALJ is required to evaluate the child's abilities in six domains of functioning. These domains measure the child's limitations with respect to: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for himself; and (6) health and well-being. 20 C.F.R. § 416.926a(b)(1)(i) - (vi). The child must have marked[2] limitations in two of these domains of functioning or an extreme limitation in one domain to qualify as disabled under agency rules. Id.

ALJ Findings

The ALJ evaluated Plaintiff pursuant to the three-step sequential evaluation for eligibility for child benefits. First, he determined that Plaintiff had not engaged in substantial gainful activity at any time relevant to the decision. AR at 14. Second, he determined that Plaintiff had the following severe impairments: attention deficit hyperactivity disorder ("ADHD"), borderline intellectual functioning, and asthma. Id. However, at step three he found that Plaintiff's impairment or combination of impairments did not meet or functionally equal the agency listings. Id.

---

[2] A "marked" limitation is one that "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. section 416.926a(e)(2). It means "'more than moderate' but 'less than extreme.'" Id. On the other hand, an "extreme" limitation "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. section 416.926a(e)(3). It is the rating given to the "worst limitations." Id.

1    In reaching this conclusion, the ALJ addressed Plaintiff's impairments under the six domains
2 of functioning previously noted. With respect to the second domain of functioning, attending and
3 completing tasks, the ALJ determined that Plaintiff had a "marked limitation." AR at 18. However,
4 with respect to each of the other five domains, the ALJ determined Plaintiff's had either no
5 limitation or a "less than marked" limitation. Id. at 18-19. As a result, he determined that Plaintiff
6 was not disabled under the Act. Id. at 19.

7    Plaintiff challenges the ALJ's decision at step three. In particular, he asserts that the ALJ
8 improperly discounted the opinion of a school psychologist and contends that if that opinion is
9 credited, he is entitled to a finding of disabled and an award of benefits. (Doc. 18 at 6-9).

**DISCUSSION**

The ALJ properly discounted the opinion of the school psychologist

12    As recounted above, Dr. Walsh, filed an "Initial Psychoeducational Evaluation" report in
13 October 2006. The stated purpose of her evaluation was to establish Plaintiff's academic
14 achievement level, his estimated cognitive ability, his adaptive behavior/self-help skills, his
15 behavioral and social strengths and any health needs to improve his school performance and
16 determine if he needed and qualified for special education services. See AR at 216. Her report was
17 based on a review of the records, teacher interviews and input, student observations, a health
18 assessment by the school nurse, clinical testing and a parent interview. Id.

19    Dr. Walsh determined that Plaintiff's cognitive ability fell in the average range. AR at 218.
20 However, she identified problems with his "fine and gross" motor skills. Id. at 222. Dr. Walsh
21 recommended that Plaintiff's parent take him to the doctor frequently to monitor the effects of his
22 medication.[3] AR at 222. She recommended also that Plaintiff be evaluated by an occupational
23 therapist regarding his gross and fine motor skills, and be evaluated by a speech pathologist due to
24 his low communication skills. Id. Finally, she recommended that Plaintiff be included in "recourse
25 specialist programs" to focus on staying on task regarding writing and penmanship. Id.

26    In May 2007, Dr. Walsh completed a "Child Functional Assessment" form. In that document

---

[3] This recommendation appears to be based upon teacher input indicating that Plaintiff had less difficulty following directions, staying on task and showing emotion when he hadn't been given his medication. See AR at 220.

11

she concluded that Plaintiff had a "marked limitation" in the domains of attending and completing tasks, and health and physical well-being, and an "extreme limitation" in the domain for moving about and manipulating objects. AR at 260.

As an initial matter, Plaintiff asserts that Dr. Walsh should be accorded the status of a treating source. In addition, he argues that "[b]ecause Dr. Walsh's opinions fit with the four corners of the eligibility established by 20 C.F.R. § 416.926a, the Court should order a payment of benefits." (Doc. 18 at 8).

20 C.F.R. § 404.902 defines a treating source as,

> Treating source means *your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you*. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for you medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a non-treating source. (Emphasis added).

Plaintiff does not allege an ongoing relationship with Dr. Walsh nor does the record indicate that Dr. Walsh saw Plaintiff frequently or consistently. Rather, the record indicates that Dr. Walsh, who was a school psychologist, performed a one-time evaluation of Plaintiff to determine the best course of action for dealing with his behavioral and cognitive problems at school. Her report does not indicate that she actually examined or interviewed Plaintiff. Rather, her report indicates that her opinions were based on a review of the records, clinical testing (it is not clear if these tests were administered by her or by other sources), teacher interviews and input, a parent interview, and student observations. See AR at 216.

Plaintiff cites Murray v. Heckler, 722 F.2d 499 (9th Cir. 1983), for the general proposition that a treating source is superior to other sources and is entitled to deference. (See Doc. 18 at 8). While this is true, Heckler does not support his assertion that Dr. Walsh qualifies as a treating source. Plaintiff states that Dr. Walsh had contact with him "more than once." (Id.) While Dr.

Walsh followed up her October 2006 report by completing a May 2007 "Child Functional Assessment," the record does not indicate that this assessment was based on additional contact with Plaintiff. In fact, it appears that this document may have been prepared to provide additional evidence in support of Plaintiff's application for social security benefits, in that it speaks exclusively to Plaintiff's limitations with respect to the six domains necessary for determining child disability under the agency regulations.[4] See AR at 259-60; see also Johnson v. Astrue, 2008 WL 4553141 at *3 (C.D. Cal., Oct. 9, 2008) (rejecting the contention that a school psychologist who participated in preparation of an IEP report for the child claimant should be considered a treating source under Social Security regulations).

       For these reasons, the Court concludes that the evidence does not establish that Dr. Walsh qualifies as a treating source as defined by 20 C.F.R. § 416.902, with the attendant deference that accompanies that designation. At best, Dr. Walsh may be considered an examining source. Nevertheless, even if contradicted by the opinions of other doctors, the ALJ may only discount Dr. Walsh's opinion by providing specific and legitimate reasons that are supported by substantial evidence. Bayliss v Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005); Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).

       Plaintiff asserts that the ALJ failed to provide specific reasons for rejecting Dr. Walsh's opinions. The Court disagrees. In fact, the ALJ did agree with Dr. Walsh that Plaintiff's ADHD created marked limitations in the domain of attending and completing tasks.[5] AR at 16. However, as noted, he rejected Dr. Walsh's findings of marked and extreme limitations regarding the domains of health and well-being and the ability to move about and manipulate objects, respectively. Id. It is his rejection of this aspect of Dr. Walsh's opinion that prompts Plaintiff's appeal.

       Upon review, the Court concludes that the ALJ provided specific and legitimate reasons

---

[4] This assessment form is in check-box format and does not explain its findings accept in the briefest manner. See AR at 260. However, the court presumes that her findings are based on the evidence she reviewed and the conclusions that she made in her October 2006 report.

[5] Plaintiff suggests erroneously that the ALJ failed to find a marked limitation in the domain of attending and completing tasks. (Doc. 18 at 7). Review of the ALJ's opinion refutes this contention. The ALJ found expressly that Plaintiff had "marked, but not extreme, limitations in attending and completing tasks." AR at 18.

supported by substantial evidence in the record for discounting Dr. Walsh's conclusion that Plaintiff had extreme and marked limitations in these domains. With respect to the domain of moving about and manipulating objects, the ALJ found Dr. Walsh's opinion inconsistent with the schools IEP, which only mandated a limited amount of extra help in the general classroom setting. AR at 16. He noted that the plan called for occupational therapy twice a month and in-class tutoring all within the context of the general education classroom. Id. This conclusion is supported by the record. See id. at 249-56. Regarding his motor skills in particular, the IEP evaluation form states that Plaintiff was making "good progress in fine motor skills" and notes that his "[c]oordination and hand skills [are] improving for tasks such as cutting, fasteners and dexterity." Id. at 250.

The ALJ cited Plaintiff's testimony concerning his daily activities to contradict Dr. Walsh's findings also. He noted Plaintiff's testimony that he had two friends and played basketball, football and tetherball at school, albeit not in organized competitions. Id. He noted that Plaintiff stated that he could dress and bathe himself, brush his teeth and feed himself. Id. at 16-17. Plaintiff testified also that he played video games, rode a bicycle, printed his name and used the microwave. Id. at 17.

The ALJ recounted that both of Plaintiff's aunts corroborated most of these activities. They acknowledged that he was able to dress himself, play video games and ride a bicycle, although his aunt Janet Butler (and guardian) denied he knew how to use the microwave. AR at 17. He noted that Janet Butler testified that Plaintiff attended regular classes and had not been held back for academic reasons or suspended for behavioral problems. Id. He noted that Dianne Butler stated that she worked with handicapped and mentally disabled children and believed Plaintiff was not as severely impaired as they were and could be taken care of by his family. Id.

In addition, the ALJ referenced the contradictory findings of Dr. Musacco and Dr. Lee. He recounted that Dr. Musacco, an examining psychologist, determined that Plaintiff had no defects in regard to his motor skills, had normal communication skills for a five-year old and only mild problems in other adaptive skills. AR at 15.

The ALJ recounted that Dr. Lee, a pediatrician, believed that Plaintiff's motor functions were normal as well. AR at 181. In particular, Dr. Lee identified testing (the Denver Development Screening Test II) that indicated that Plaintiff "is performing within age limits for gross motor

development." Id. at 182.  While noting Plaintiff's "very hyperactive demeanor," Dr. Lee described Plaintiff's asthma as mild and under control.  Id.  In fact, other than noting Plaintiff had dermatitis, he characterized his examination of Plaintiff as "unremarkable."  Id.  The ALJ believed that the testimony of Plaintiff and his aunts, together with the findings of Drs. Lee and Musacco, suggested that any difficulties concerning a lack of coordination or muscle weakness "were transient rather than signs of permanent impairment, and that he does not have ongoing limitations in this domain." Id. at 19.  Moreover, he believed that the activities Plaintiff and his aunts testified to, such as playing sports, throwing a ball, riding a bicycle, turning on the television and playing video games, and printing his name, evidenced an ability to move about and manipulate objects that was less than marked or extreme.  See id.

Regarding the domain of health and well-being, the ALJ cited Dr. Lee's findings and the testimony from Plaintiff and his aunts to support his conclusion of less than marked limitations.  AR at 19.

Upon review, the Court concludes that the ALJ's interpretation of this evidence is reasonable and finds that he has cited substantial evidence in the record to support his conclusion that Plaintiff is not disabled.  Plaintiff acknowledges that Dr. Walsh's opinions directly conflict with those of the other examining consultants as well as the non-examining consultants.  (See Doc. 18 at 6, 7).  In fact, the ALJ appreciated this and noted "a substantial conflict in the evidence concerning the claimant's functioning in [the domain of moving about and manipulating objects]."  AR at 18. Under these circumstances, it was the ALJ's duty to resolve any differences and reach a conclusion. Thomas v. Barnhart, 278 F.3d 947, 956-57 (9th Cir. 2002) ("When there is conflicting medical evidence, the Secretary must determine credibility and resolve the conflict.")

Plaintiff contends that in relying on the "stale" findings of the consulting examiners, the ALJ ignored the "new" evidence from Dr. Walsh and the occupational therapist, Jami Grover, who filed a report in March 2007.  (Doc. 20 at 4, 5).  The Court disagrees.  The Court notes that Dr. Lee and Dr. Musacco examined Plaintiff just four months before Dr. Walsh issued her report and less than nine months before the occupational therapist issued her report.  Plaintiff's suggestion that the reports of Drs. Lee and Musacco are stale is not convincing.

Second, Plaintiff contends that no "qualified" pediatrician or psychologist reviewed Dr. Walsh's opinion. Records indicate that Dr. Lee is a board-certified pediatrician and Dr. Musacco is a clinical and forensic psychologist. AR at 181, 184. While it is true that they examined Plaintiff prior to Dr. Walsh's report, his suggestion that this diminished the value of their findings is not supported by case law or citation to rules or regulations.[6] As noted, their examinations were essentially contemporaneous to Dr. Walsh's report. In addition, a non-examining agency consultant, Dr. Frye, completed a "Childhood Disability Evaluation" form in March 2007 and noted Dr. Walsh's earlier findings and opinions. AR at 240-41. Nevertheless, Dr. Frye agreed with Drs. Lee and Musacco that Plaintiff did not have marked limitations in the domains of moving about and manipulating objects or in health and well-being. Id. at 237, 241; see Salee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996) ("We have held that the findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings.") Although no expert reviewed Dr Walsh's May 2007 "Child Functional Assessment," there is no authority presented that this report, which appears to have relied upon Dr. Walsh's October 2006 evaluation of the child, impacted the case evaluation because it added only categorical conclusions, rather than any substantial analysis of the child's condition.

Finally, the ALJ acknowledged the occupational therapist's March 2007 report. In particular, he noted her conclusion that Plaintiff had problems with motor skills, including a "weak grip and

---

[6] Though not explained Plaintiff cites Acquiescence Ruling 04-1(9) to support this contention. However, nothing in the quoted language of that ruling supports his suggestion that Dr. Lee's or Dr. Musacco's opinions should be accorded less weight because they failed to discuss Dr. Walsh's findings. In fact, that ruling states that the agency may rely upon a "case evaluation made by a State agency medical or psychological consultant that is already in the record." (See Doc. 18 at 7). Plaintiff cites also Howard on behalf of Wolff v. Barnhart, 341 F.3d 1006 (9th Cir. 2003), to support his assertion that a medical expert should have been called by the ALJ to review the "new" evidence from Dr. Walsh and the occupational therapist. Wolff fails to support his position.

In Wolff, the ALJ failed to obtain a "case evaluation" that considered the totality of the child's circumstances and, instead, "construct[ed] his own case evaluation from the evidence in the record." Wolff, at 1014. Contrary to this situation, here the ALJ received reports from a board-certified pediatrician and a clinical and forensic psychologist who performed consultative examinations of Plaintiff to discern his overall condition. See AR at 181-83; 184-88. In addition, a non-examining agency consultant filed an assessment of Plaintiff's condition that cited and outlined this "new" evidence. See AR at 240-41. This comports with 42 USC 1382c(I) which provides, "In making any determination under this title [42 USCS §§ 1381 et seq.] with respect to the disability of an individual who has not attained the age of 18 years and to whom section 221(h) [42 USCS § 421(h)] does not apply, the Commissioner of Social Security shall make reasonable efforts to ensure that a qualified pediatrician or other individual who specializes in a field of medicine appropriate to the disability of the individual (as determined by the Commissioner of Social Security) evaluates the case of such individual."

weak muscles." See AR at 232, 233.  However, as noted, the ALJ cited Plaintiff's testimony concerning his daily activities which were corroborated by the testimony of his aunts.  AR at 19.  The ALJ believed that these activities supported a conclusion that Plaintiff's limitations in the domain of moving about and manipulating objects were less than marked.  Dr. Frye's March 2007 assessment addressed and acknowledged the occupational therapist's findings also.  Id. at 241.  Nevertheless, he concluded that Plaintiff had no limitation with respect to this domain.  See id. at 237, 241.

## CONCLUSION

In sum, the Court concludes that the ALJ provided specific and legitimate reasons for discounting Dr. Walsh's findings that Plaintiff had a marked limitation in the domain of health and well-being and an extreme limitation in the domain of moving about and manipulating objects.  Moreover, substantial evidence in the record supported the ALJ's conclusion that Plaintiff's impairments did not satisfy the requirements for a finding of disability and, as a result, the Court must defer to that determination.

Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The Clerk of Court IS DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff Connell L.

IT IS SO ORDERED.

Dated:   **August 11, 2010**                              /s/ Jennifer L. Thurston
                                                                         UNITED STATES MAGISTRATE JUDGE